2020 IL App (3d) 170386

Opinion filed May 27, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0386 Circuit No. 15-CF-87 |
| MATTHEW CRANE, | ) ) ) | Honorable Terence M. Patton |
| Defendant-Appellant. | ) | Judge, Presiding |

_____

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice Holdridge concurred in the judgment and opinion.

_____

**OPINION**

¶ 1    Defendant Matthew Crane was convicted by a jury of unlawful possession with intent to deliver cannabis and unlawful possession of cannabis and sentenced to a term of 30 months' probation and 120 days in jail. We reverse his convictions in part, affirm in part and vacate his sentence.

¶ 2                                    FACTS

¶ 3    Defendant Matthew Crane was charged with unlawful possession and unlawful possession with intent to deliver between 500 and 2000 grams of cannabis. 720 ILCS 550/4(e), 5(e) (West

2016). The charges arose from an incident at the Best Western Geneseo Inn where Crane stayed overnight, sharing a room with his friend and codefendant, Ranzy Weston. The hotel manager called the police after Crane and Weston failed to check out on time and because she thought they were behaving oddly by walking in the grass abutting the parking lot. After the police arrived, they searched the room in which Crane and Weston stayed and discovered a bag with residue of a green leafy substance in the garbage can. Crane and Weston were arrested, and a drug dog performed a free air search and alerted on both vehicles. After the police obtained a warrant, the vehicles were searched. The search uncovered four bags of cannabis in Weston's trunk and five cannabis cigarettes in Crane's vehicle.

¶ 4       A jury trial took place. Deborah Taylor, the Best Western manager, testified. She called the police because Crane and Weston had not checked out on time and she saw two people whom she did not know running around in the grass by the hotel parking lot, behavior she found odd. After a police officer spoke to the men, Taylor was informed by the officer that the men were guests at the hotel and that he told them to check out. After Crane checked out, on the officer's suggestion, they checked the hotel room for damage and found a green leafy residue in a bag in the garbage can in the room.

¶ 5       Geneseo patrol officer Michael Chavez testified he was one of the officers who responded to Taylor's call regarding suspicious activity. The call indicated that some hotel guests who had not checked out were acting strangely. Chavez identified Crane in court as one of the men he encountered in the hotel parking lot. He also identified Crane from his mug shot. According to Chavez, Crane told him he found money in the grass. Chavez then left Crane and Weston and met with the other responding officer, Benjamin Sleaford, to speak to the hotel manager. They asked Taylor to see the room the men rented. Chavez smelled an "overwhelming" odor of raw cannabis

2

and a little odor of burnt cannabis in the room. In the trash, he found a FoodSaver vacuum sealer bag with the green leafy residue in the bottom.

¶ 6 He and Sleaford returned to the parking lot and he told Crane he smelled cannabis in the room and on Crane's person. Crane had a medical marijuana card but did not have the card with him. Crane told Chavez he was from Michigan but had moved to Colorado and was traveling to Virginia to see relatives. He said he and Weston were longtime friends and then said they met at a gas station and decided to share a hotel room. Chavez thought Crane seemed under the influence because he was jittery and told a disconnected story. In Chavez's experience, people are often nervous speaking with the police. In response to the State's inquiry whether his interaction with Crane was "the same or different than a normal, innocent member of the public," Chavez said it was not the same. Crane did not make any incriminating statements.

¶ 7 Crane was arrested and a free air search resulted in an alert by the drug dog on Crane's Jeep and Weston's Ford rental car. While another officer was obtaining warrants to search the vehicles, Chavez went to the hotel office to view the surveillance videos. Chavez explained how he used a digital camera stacked on books to record a computer screen playing the surveillance video. The hotel's system did not have the capacity to transfer the video. According to Chavez, the video showed Crane and Weston arriving at the hotel at the same time; "walking together, getting in and out of each other's vehicles when they arrived"; Weston removing bags from Crane's Jeep; and Crane going to Weston's car before the men went into the hotel together. The trial court admitted the video into evidence and three excerpts were played for the jury.

¶ 8 The first excerpt showed the parking lot of the hotel at 1:09 p.m. on the day of the arrests. Weston walked to his car, carrying the black bag and another item. He put the item on the car roof and placed the black bag in the trunk. He opened the front and back doors on the driver's side,

3

reached into the front seat and returned to the trunk. He stood there apparently rearranging items in the trunk. He next removed the black bag from the trunk and placed it in the backseat. Weston then waited outside the car for approximately 20 minutes. The video next showed Crane walking to the grass next to his Jeep. Weston joined him and the two men walked back and forth in the grass, occasionally getting on their hands and knees and picking something up. The video was fast forwarded. A police car drove up, Crane and Weston walked over to it, the squad left, and Crane and Weston left the parking lot. They returned a few minutes later, each man going to his own vehicle and then returning to the grass. The officers came back, the four men spoke, and the officers accompanied Crane and Weston to their individual vehicles.

¶ 9        The second excerpt showed the parking lot at 1:55 a.m. when Crane and Weston initially arrived at the hotel. Crane removed a garbage bag and other items from his vehicle, walked near Weston's car, paused briefly and then left the parking lot, presumably to enter the hotel. Weston removed a black bag from the trunk, walked to Crane's vehicle, took something from the trunk area, returned to his car, spent a few minutes at his open trunk, and then left the parking lot, also presumably to enter the hotel.

¶ 10        The third excerpt shows Weston walking down the hotel hallway, carrying the black bag. Shortly thereafter, Crane is seen walking down the hall toward the camera and then returning carrying something like an article of clothing. The State paused the video and Chavez again identified Crane and Weston. In response to the State's inquiry as to what Weston was carrying, Chavez identified the black bag as the one that Weston placed in his car the following day.

¶ 11        Chavez continued with his testimony. When the warrants were secured, officers searched Crane's and Weston's vehicles. They found four bags of cannabis in Weston's trunk. Each bag weighed 1½ pounds. The substance field-tested positive for cannabis. A cell phone, $613 and a

4

rental car agreement were also found in Weston's car. In Crane's vehicle, the officers found a cell phone, a box of FoodSaver bags and five cannabis cigarettes. He believed Crane had some money on his person. Chavez described the phones found in the vehicles as matching each other, of the same make and model, without covers or scratches and appearing to be new. He testified that either Crane or Weston was in possession of an additional cell phone, which Chavez described as a personal cell phone. Chavez identified the FoodSaver bags as identical to the bag found in the room and the bags that held the drugs found in Weston's trunk as similar to the ones in the FoodSaver box found in Crane's vehicle.

¶ 12        Officer Chavez also testified that he had training in advance cannabis trafficking. Traffickers would use a decoy vehicle, being one car driving ahead of the other car carrying contraband. The idea was for the lead car to get pulled over, allowing the following car to avoid police detection. He had only encountered the use of a decoy vehicle a couple of times. Traffickers commonly packed cannabis in FoodSaver bags to disguise the odor and for ease of transport. He determined the street value of seized drugs by considering the price in a source state such as Colorado and by asking people he arrested what they paid for the drugs he seized.

¶ 13        On cross-examination, Chavez compared the FoodSaver bags found in the room and in the Jeep and discovered they were different, with the only commonality being that "FoodSaver" was printed on all the bags. The bags were not tested for fingerprints. FoodSaver bags are used for other purposes besides drug trafficking. He described Crane's vehicle as "disheveled" and "lived in," which was a characteristic of drug traffickers who traveled the country with their contraband. He did not see Crane with any cannabis except the five cannabis cigarettes that were found in Crane's vehicle. He did not see Crane with the black bag in which the cannabis was found, and the bag was not in Crane's vehicle. He did not know who bought the cell phones found in the vehicles,

5

if they worked or if Weston and Crane used them to call each other. The cell phones were not tested or checked, and he was unaware if they worked. The defense replayed a portion of the hotel surveillance video, and Chavez acknowledged that Crane never held the black bag that contained the bags of cannabis in Weston's car. The video shows Crane carrying a pillow into the room.

¶ 14    Benjamin Sleaford, a Geneseo police department detective, testified. He had some training in cannabis trafficking and drug identification. Drugs were commonly transported in vacuum-sealed packages to avoid detection. He responded to the hotel based on the manager's call for a welfare check about some guests who had not checked out and were running around in the parking lot. Because of the odd behavior, he suggested they check the hotel room. It smelled overwhelmingly of raw cannabis. He did not smell burnt cannabis. He found a vacuum-seal type bag in the trash that contained suspected cannabis residue. After he and Chavez returned to the parking lot, he arrested Weston and read him his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)). Neither Weston nor Crane made any statements. He obtained warrants to search both vehicles and executed the searches.

¶ 15    Illinois State Police trooper Sean Veryzer conducted a free air search of both vehicles with Roman, his drug dog. Roman alerted to the rear passenger side of Weston's car and the driver's door of the Jeep. Veryzer saw cannabis in the trunk of Weston's car and smelled a strong odor of cannabis emanating from Crane's vehicle.

¶ 16    Michelle Dierker, a forensic scientist at the Illinois State Police Morton Forensic Science Lab, testified. She weighed and analyzed the cannabis. The five cannabis cigarettes found in Crane's vehicle weighed 3.6 grams and tested positive for the presence of cannabis. Three bags of cannabis from Weston's trunk weighed 521 grams, 406 grams, and 454 grams and tested positive

6

for cannabis. Two other bags weighing 487 grams and 89 grams were not tested. The cannabis cigarettes found in Crane's vehicle were not compared to the cannabis found in Weston's trunk.

¶ 17 The State rested and the defense moved for a directed verdict, arguing the evidence was insufficient to connect Crane to the cannabis found in Weston's trunk. The trial court denied the motion, and the defense presented its case.

¶ 18 Weston testified. He had pleaded guilty to offenses concerning the cannabis found in his vehicle. He lived in Virginia and had worked with Crane in 2006 and they remained friends. He had flown to Colorado on a one-way ticket. He was not in school and was working temporary jobs, so he planned to have an extended stay visiting friends and family. He contacted Crane to hang out and they met up several times. Both men were planning to go to Virginia in April and decided to share a hotel room along the way. Weston rented a Ford car and Crane drove his own vehicle. Weston placed his personal belongings and a box of FoodSaver bags in Crane's vehicle because he was worried that they smelled like cannabis and he would be charged a smoking fee from the rental company. He and Crane talked on their cell phones during the trip but not about watching for the police.

¶ 19 When he arrived in Illinois, Weston stopped at his friend's house in Moline to see if he and Crane could stay there and to pick up cannabis. He did not tell Crane about the cannabis and Crane did not accompany him to his friend's house. He met Crane later at a gas station and they went to the hotel together. He paid for the room and brought the black bag with the cannabis into the room. Crane left to buy food and medicine and Weston rearranged his belongings. After Crane returned, they went to sleep. They did not smoke any cannabis and Weston did not smell it in the room.

¶ 20 When Weston woke up, Crane was still asleep. Weston readied his things and called the front desk to request a late checkout. At approximately noon, he loaded the black bag into his car

7

and his personal belongings into Crane's Jeep. He waited for Crane to wake up. When Crane came out and loaded his Jeep, Weston went to check out but no one was at the desk. Upon his return to the parking lot, Crane said he had found money in the grass and Weston joined him in looking. Weston found about $485 and had $200 of his own money. The police arrived and he and Crane told them they found money in the grass and were getting ready to check out. Weston returned to the grass with Crane, where the officers again approached them and informed Weston and Crane they would be arrested for trespassing if they did not talk to the officers. Weston explained he was driving from Colorado and had just checked out of the hotel. The officers said they had found a bag with cannabis in their hotel room, which Weston asked to see. The officers denied his request and asked if he had any contraband. Weston was arrested and put in the squad car. He did not make a statement.

¶ 21      On cross-examination, Weston said he bought his one-way plane ticket for $300 to $400 but opted to drive back to Virginia because he wanted to visit a friend along the route, take advantage of the good rental car rate, and use the car in Virginia for a while. The State questioned why Weston would use a rental car at $92.68 per day, to which Weston corrected the rate was about $15 per day. Per the rental agreement, the daily rental rate was $13.24.

¶ 22      Crane testified. He was a medical marijuana patient, currently living with his mother in Virginia, studying for an Information Technology (IT) certificate, and doing freelance work. At the time of his arrest, he was between apartments and kept many of his belongings in his Jeep. He and Weston worked together in Virginia in 2007 or 2008. When Weston visited Colorado, they hung out and smoked pot. They both had plans to drive to Virginia for the Easter holiday and decided to split the cost of a hotel room on the way, although they hoped to have a free place to stay in Illinois. Weston placed his bag of personal belongings in Crane's Jeep because he was

8

worried about the rental company charging a fee because they smelled like cannabis. He was a few hours behind Weston on the trip because his Jeep was old, could not drive faster than 65 miles per hour and lacked cruise control. He had to stop twice as often as Weston. He was not sure whether he had both his personal and his business phones with him. He and Weston touched base as they travelled but did not talk about the police. Crane did not go with Weston to Moline and did not know about the cannabis. They eventually met at a gas station, filled up their vehicles, and went to a hotel. At the hotel, he unloaded several garbage bags of belongings, including clothing, pillows and blankets. Weston took some of his belongings out of the Jeep but Crane was not present. He did not see Weston bring the cannabis into the hotel room. He left to buy some cold medicine and went to sleep upon returning to the room. He did not see the black bag or the box of FoodSaver bags. No one smoked cannabis in the room.

¶ 23       Crane slept until noon. When he woke up, Weston was gone trying to check out and had already loaded his belongings. Crane got ready and noticed a small plastic bag with five cannabis cigarettes in the bottom of his backpack. The cannabis in the cigarettes did not come from Weston's packages of cannabis. He tried to flush one of the cannabis cigarettes down the toilet but it floated, so he took the cigarettes with him. He tried to clean the bag out with a bar of soap in case a child found it. He did not smell the odor of cannabis but the odor the police smelled in the room might have come from the bag. He took his belongings to the Jeep, and he and Weston found about $700 in the grass next to the parking lot. He started the trip with $200 in traveling money. Chavez arrived and questioned what they were doing. He was not under the influence. He and Weston went to check out, returned to the grass and were approached by officers who said Crane and Weston would be arrested for trespassing if they did not talk to them. The officers said they found a bag in the hotel room and asked if they had any drugs. He told the officers he and Weston

9

were longtime friends who met up at the gas station so they could share a hotel room. He was handcuffed in the squad car during the dog sniff of his vehicle. He had not seen or used the box of FoodSaver bags found in his vehicle. He admitted only to possession of the five cannabis cigarettes found in his vehicle.

¶ 24   At closing, the State argued that Crane and Weston were working as a team, that they travelled together, and that Crane was driving the decoy vehicle and put the five cannabis cigarettes in his vehicle to distract the police. The State pointed to the FoodSaver bags found in the Jeep, which they described as matching the bags holding the drugs found in Weston's car, as evidence that Crane and Weston were part of a team. Likewise, the State argued that the cell phones discovered in each man's vehicle were identical, throw-away phones they used to communicate about police along the route. The State further argued that Weston's claim that it was more cost-effective to travel together did not make sense. The State further offered that "the opportunity that presents itself when Colorado legalized marijuana, to take that marijuana elsewhere where it's not legal and sell it for a profit, is too good to pass up, and so they begin a plan."

¶ 25   The jury recessed for deliberations and asked to see the rental car agreement. The trial court denied the request because the document was not admitted into evidence. The jury also requested and was provided the five cannabis cigarettes. The jury found Crane guilty of unlawful possession with intent to deliver more than 500 and less than 2000 grams of cannabis, unlawful possession of more than 500 and less than 2000 grams of cannabis, and unlawful possession of more than 2.5 and less than 10 grams of cannabis. Crane moved for a new trial, which the trial court denied. The court sentenced Crane to 120 days' imprisonment and 30 months' probation. He appealed.

¶ 26                                      ANALYSIS

10

¶ 27    Crane raises five issues on appeal: the evidence was insufficient to convict him, the State presented improper comments in its closing argument, and the court erred in admitting his mug shot into evidence, in allowing commentary on the video, and in refusing the jury's request to see the rental car agreement.

¶ 28    We begin with Crane's sufficiency of the evidence argument. He argues the State failed to prove him guilty beyond a reasonable doubt of unlawful possession with intent to deliver and unlawful possession of more than 500 grams and less than 2000 grams of cannabis. He does not contest his conviction for possession of more than 2.5 grams but less than 10 grams of cannabis. He asserts that the State's accountability theory was based solely on unreasonable inferences and did not establish that there was an agreement between him and Weston regarding the cannabis.

¶ 29    The State must prove every element of an offense beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). In determining a challenge to the sufficiency of the evidence, all evidence must be viewed in a light most favorable to the State. *People v. Smith*, 185 Ill. 2d 532, 541-42 (1999). All reasonable inferences in favor of the State are allowed but unreasonable or speculative inferences are not permissible. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Where the evidence creates a reasonable doubt as to the guilt of the defendant, the conviction must be set aside. *Smith*, 185 Ill. 2d at 542. When reviewing a sufficiency of the evidence claim, we consider whether any rational trier of fact could have found the State proved the essential elements of the offense beyond a reasonable doubt. *People v. Pollock*, 202 Ill. 2d 189, 217 (2002).

¶ 30    To sustain a conviction for unlawful possession with intent to deliver, the State must prove (1) defendant knew of the narcotics, (2) the narcotics were in his immediate possession or control, and (3) defendant intended to deliver the narcotics. *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). To sustain a conviction for unlawful possession, the State must prove the defendant knew of the

11

presence of the drugs and they were in his immediate possession and control. *People v. Thomas*, 242 Ill. App. 3d 266, 274 (1993). Possession may be actual or constructive. *Id.* The factfinder generally is in the best position to determine witness credibility and a reviewing court will not retry the defendant but will reverse a conviction only where the evidence is so improbable or implausible as to sustain a conviction. *In re Nasie M.*, 2015 IL App (1st) 151678, ¶ 23.

¶ 31    To establish guilt by a theory of accountability, the State must prove that "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2018). Under a common-design theory of accountability, any party to an agreement to commit an offense is accountable for the other party's acts in furtherance of the agreement to commit the offense. *People v. James*, 2017 IL App (1st) 143391, ¶ 44. To prove the defendant possessed the required intent, the State must establish (1) the defendant shared the principal's criminal intent and (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). An accomplice's intent may be inferred from the character of the defendant's acts and the circumstances surrounding the offense's commission. *Id.*

¶ 32    Here, the State presented the following facts: Officers encountered Crane and Weston in a hotel parking lot in Geneseo, Illinois. The officers determined that the men had spent the previous night at the hotel and were both travelling from Colorado to Virginia. Weston was driving a rental car, with a rental fee of $13.24 per day. Weston had a large black bag in the trunk of his vehicle that he removed while he was alone and put it back into his vehicle the next day when he was alone. The black bag contained four bags of cannabis vacuum sealed in FoodSaver bags. Crane's Jeep contained five cannabis cigarettes. His vehicle was messy and there was a box of FoodSaver bags found in his vehicle that were similar, but not the same, as the ones that were used to seal the

12

cannabis found in Weston's black bag. In addition, Crane and Weston each had a cell phone, and one of them may have had more than one cell phone. The cell phones appeared new and were similar.

¶ 33     Based on those facts, the State argued that Crane and Weston decided to purchase a large quantity of cannabis in Colorado and transport it to Virginia for the purposes of reselling the cannabis in Virginia. According to the State, the facts showed that Crane was driving ahead of Weston acting as the decoy vehicle with a small amount of cannabis in order to distract the police so Weston could drive past the officers undetected. The State offered the cell phones and the FoodSaver bags found in Crane's Jeep as evidence to support its theory. However, the State's evidence simply does not support those inferences.

¶ 34     First, the State asserts that Weston had the cannabis in his vehicle upon leaving Colorado and that he and Crane travelled in tandem from Colorado to Geneseo with Crane driving in the lead. However, none of the State's evidence refutes Crane's testimony that he was several hours behind Weston. Nor did the State present any evidence that the drugs in the black bag in Weston's vehicle originated from Colorado rather than from Moline where Weston testified he travelled alone to meet a friend and pick up the cannabis. The State offered no evidence the cannabis originated in Colorado. It did not test and compare the cannabis found in Weston's trunk with the cannabis in the five cigarettes found in Crane's vehicle, which admittedly did originate from Colorado, to see if they were the same. The State did not present Weston's friend as a witness to rebut his testimony that he obtained the large quantity of cannabis in Illinois. Likewise, the video of the hotel parking lot showed that Weston was alone when he removed the black bag from his vehicle and was alone when he placed the bag back into the vehicle the next day. The video establishes that Crane did not touch the black bag either upon entering or leaving the hotel. Both

13

Crane and Weston testified that Crane was unaware that Weston had cannabis in his trunk and neither the video evidence nor the testimony at trial established otherwise. The State's theory regarding the supposed plan to obtain cannabis in Colorado and sell it elsewhere was based on nothing more than the fact that Crane's and Weston's journeys began in Colorado, where recreational cannabis was legal, and they were travelling together. The theory is nothing more than speculation and the evidence is insufficient to render the State's inferences reasonable. *People v. Fickes*, 2017 IL App (5th) 140300, ¶ 24 (finding State's evidence to be speculation rather than a reasonable inference where no evidence was produced to sustain an element of the offense).

¶ 35    Next, the testimony of Chavez that Crane and Weston had cell phones that appeared new and also appeared to be very similar does not, without more, support the inference that the phones were burner phones purchased by Crane and Weston to use during this trip to alert each other about police presence as part of their common plan to transport drugs. There was no evidence to establish when or where the phones were purchased or by whom or if the calls between Crane and Weston were initiated by Crane as the decoy vehicle driver. The only evidence the State offered regarding the cell phones was Chavez's testimony that the phones looked to be the same. The State did not present a receipt showing the phones were purchased in anticipation of the trip or bought at the same time. The State did not offer any records establishing phone calls or texts between Crane and Weston in route. Indeed, as Chavez testified, the State was not aware whether the phones worked as the police never tested or examined them. Without more, the fact that both Crane and Weston had similar phones in their vehicles does not indicate a common plan to transport cannabis. Although we must draw all reasonable inferences in favor of the State, we " 'should not make random speculation' " in its favor. *People v. Petty*, 2020 IL App (3d) 180011, ¶¶ 18 (quoting *People v. Dye*, 2015 IL App (4th) 130799, ¶ 12); see also *id.* ¶ 21(allowing State's theory regarding

14

drug chemistry without offering expert testimony supporting it "would be tantamount to making a random speculation").

¶ 36       Third, Crane testified that he was several hours behind Weston as they travelled because his vehicle was older, was not fuel-efficient and lacked cruise control. He explained that he was required to stop more frequently for gas than Weston, who was driving a newer model car, and that his Jeep was not able to travel faster than 65 miles per hour. The evidence indicates that Crane did not arrive in Geneseo until sometime after Weston had already been in Illinois, visited his friend in Moline for a couple of hours and arrived at the gas station meeting place before Crane. The State did not counter Crane's claims regarding the deficiencies of his vehicle and failed to offer any contrary evidence to support its theory that Crane and Weston travelled together in a convoy to avoid detection by law enforcement. It did not establish that they made stops together along the way. Rather, both Crane and Weston testified that they each paid for their own gas and food as they traveled and presumably made stops as each driver and vehicle needed. The State failed to present proof to contradict both Crane's and Weston's testimony that Weston arrived at the gas station near the hotel in Geneseo before Crane, even after stopping in Moline to visit his friend. No video was offered from the gas station depicting Weston's and Crane's arrivals there. The State's reliance on these facts to support its inference of a common plan is not reasonable and we find the facts do not support its theory. See *People v. Laubscher*, 183 Ill. 2d 330, 332-33 (1998) (reversing defendant's conviction, even though it found the trial court's inference reasonable because the facts did not support the inference).

¶ 37       On these facts, the State did not prove there was evidence of a criminal plan or even that Crane was aware Weston had the cannabis in his trunk. While circumstantial evidence may be sufficient to sustain a conviction, the inferences it raises must be reasonable and tend to establish

15

the defendant's guilt. *People v. Saxon*, 374 Ill. App. 3d 409, 418 (2007). In *People v. Smith*, 2014 IL App (1st) 123094, ¶ 1, the defendant was convicted of burglary after being found in possession of automobile parts. The reviewing court found that the State failed to connect the items in the defendant's possession to items missing from the auto part store he was alleged to have burglarized. *Id.* ¶ 15. The court reached the conclusion despite the defendant being found with auto parts in his possession and identified as throwing auto parts over the fence surrounding the auto parts store, and in light of the store owner's testimony that various auto parts were missing from the store. *Id.* The owner described that he discovered shock absorbers, brake pads and springs were missing, and the defendant was found with "a lot of different" car parts, including mufflers, pipes, and bolts. (Internal quotation marks omitted.) *Id.* The reviewing court considered that any conclusion that the auto parts the defendant possessed were items from the auto parts store "would be based on conjecture rather than inference." *Id.*

¶ 38    Similarly here, the State relies on inferences that are not supported by the facts but are based on conjecture or speculation. The State's theory of a common plan amounts to nothing more than a mere hunch. The State's facts do not tie Crane's and Weston's travel plans, the cell phones, the FoodSaver bags and the cannabis to an agreement between them to commit a criminal offense. Even viewing the evidence in the light most favorable to the State, the fact, taken together, do not validate the State's inferences. Although we draw all reasonable inferences in favor of the State when reviewing the sufficiency of the evidence, we will not "allow unreasonable inferences." *Cunningham*, 212 Ill. 2d at 280. We find the State failed to prove that Crane possessed the cannabis with an intent to deliver beyond a reasonable doubt or that he possessed more than 500 but less than 2000 grams of cannabis. We reverse his conviction on those offenses and vacate his sentence.

16

¶ 39    Lastly, Crane does not appeal his conviction based on the five cannabis cigarettes in his possession. He admitted the cigarettes were his and told Chavez when he was arrested that he had a medical cannabis card but did not produce the card then or at trial. We consider the evidence sufficient for a finding of guilt of possession of more than 2.5 and less than 10 grams of cannabis. We thus reinstate his conviction for the offense, which is a class B misdemeanor. We note that under the laws in place at the time of Crane's conviction, the sentence for a Class B misdemeanor would have been not more than six months imprisonment and probation not to exceed two years. 730 ILCS 5/5-4.5-60(a), (b) (West 2016). The sentence he received was 120 days' in the county jail and 30 months' probation. Based on our calculations, Crane has served his jail time and the term of probation and has been discharged. We find no reason to remand for further sentencing. See *People v. Dunn*, 40 Ill. App. 3d 684, 686 (1976) (remand for resentencing not necessary where defendant who was provided improper admonishments already served his sentence when appeal decided).

¶ 40    Because of our disposition on the sufficiency of the evidence issue, we need not address the other issues Crane raised on appeal.

¶ 41                                CONCLUSION

¶ 42    For the foregoing reasons, the judgment of the circuit court of Henry County is affirmed in part and reversed in part, and the sentence is vacated.

¶ 43    Affirmed in part and reversed in part. Sentence vacated.

**No. 3-17-0386**

| | |
|---|---|
| **Cite as:** | *People v. Crane*, 2020 IL App (3d) 170386 |
| **Decision Under Review:** | Appeal from the Circuit Court of Henry County, No. 15-CF-87; the Hon. Terence M. Patton, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Peter A. Carusona, and Editha Rosario-Moore, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Matthew Schutte, State's Attorney, of Cambridge (Patrick Delfino, Thomas D. Arado, and Chelsea E. Kasten, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |