2024 IL App (1st) 230232-U

No. 1-23-0232

Order filed January 10, 2024

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Boone County. |
| | ) | |
| v. | ) | No. 19 CF 276 |
| | ) | |
| GREGORY P. ROBINSON, JR., | ) | Honorable |
| | ) | Ryan A. Swift, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Reyes and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The evidence was insufficient to establish that defendant constructively possessed heroin recovered from the car in which he was a passenger.

¶ 2     Following a bench trial, defendant Gregory P. Robinson, Jr., was convicted of possession of a controlled substance (PCS) with intent to deliver (720 ILCS 570/401(a)(1)(A) (West 2018)) and sentenced to 13 years and 6 months in prison. On appeal, defendant contends that the State failed to prove beyond a reasonable doubt that he possessed drugs that were recovered from the

pouch behind the driver's seat of the car in which he was a passenger. For the reasons that follow, we reverse.[1]

¶ 3    Defendant's conviction arose from a traffic stop that occurred on I-90 near Belvidere, Illinois, on October 13, 2019. Following arrest, defendant was charged by indictment with one count each of PCS with intent to deliver heroin, PCS of heroin, PCS with intent to deliver cocaine, and PCS of cocaine. Prior to trial, the State "dismissed" the two cocaine charges because it had "no lab results to support those charges." Three witnesses testified at trial: the car's driver, the trooper who pulled the car over, and an officer with the local narcotics unit. The trooper's dashcam video was also introduced into evidence.

¶ 4    At trial, Quinton Ashford, defendant's brother-in-law, explained that he was appearing as part of a plea deal by which he would plead guilty to a Class 4 PCS charge, testify against defendant, and receive two years of "410" probation.

¶ 5    On October 12, 2019, Ashford and defendant, who both lived in Wisconsin, made a plan to travel to Chicago the next day so that Ashford could briefly visit his aunt and defendant could visit his brother or a friend. Defendant agreed to pay Ashford $100 and pay for gas and tolls. At the time, Ashford had owned his car for four or five months. The only people who had been in the car other than Ashford were his children, whom he drove back and forth to school.

¶ 6    Ashford testified that he picked defendant up around 8 or 9 a.m. on October 13, 2019. He drove to Chicago, dropped defendant off on the east side, visited his aunt on the south side, and then picked defendant up for the return trip to Wisconsin. During the drive back to Wisconsin,

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

they were stopped by Illinois State Troopers. Ultimately, the troopers placed Ashford under arrest and told him they found drugs in the pouch behind the driver's seat.

¶ 7    Ashford testified that he did not know anything about the drugs and he had not seen anyone place anything in the pouch behind the driver's seat. He agreed that when he let the troopers look through his cell phone, they "locate[d] one text message concerning marijuana" and that he "had sent a message to somebody about buying about $30 worth of marijuana." Ashford also agreed "there were also two other cell phones *** located in the car." The phones were admitted into evidence as People's Exhibits No. 3 and No. 4. When shown the phones in court, Ashford stated that they belonged to defendant.

¶ 8    On cross-examination, Ashford testified that he had a valid Wisconsin driver's license at the time of his arrest. He never saw defendant enter or reach into the back seat of the car. When asked whether, when he picked defendant up on the east side of Chicago, defendant had anything in his hands, Ashford answered, "Not that I recall." He also did not see defendant take anything out of his pockets when he entered the car.

¶ 9    Ashford stated that when he entered the trooper's squad car, he was not nervous. He agreed that he had rubbed his face, but stated that was "[j]ust something that I do." He acknowledged that he did not tell the trooper "everything" while in the squad car. When asked whether, after he was at the station, his story started to change and expand, he answered, "I would guess." He engaged in the following exchange with defense counsel:

"Q. Your testimony here today was that you had no knowledge of the drugs in the vehicle; is that correct?

A. That's correct.

Q. But you're going to plead guilty to it?

A. Because drugs was found in the vehicle.

Q. In your vehicle.

A. Yes. It's my vehicle but there wasn't no drugs in there before he got in my car so it's my car. I know for a fact what's in my car.

Q. Okay.

A. There was no drugs in my car before [defendant] entered my car.

Q. Okay. But you never saw him go into the back seat, correct?

A. Don't matter. He could have put that back there when I was in the trooper's car talking to the trooper. How easy it [*sic*] for somebody to slip something in those slots that is right there when me and the trooper is back discussing what was the purpose of me being in Chicago in the first place.

Q. Sure.

A. So, you keep saying my car, my car, yeah, I know it was my car, but, like I said, it's my car. I know what's in my car. He put that there when I was talking to the trooper because before then it wasn't in there.

Q. How do you know he put that in there is my question, sir?

A. How else did it get in there?"

¶ 10    When asked whether it was correct that the text messages on his phone regarding drug transactions did not say anything about marijuana, Ashford answered, "If you say so," and stated that he was not sure, as it had been "so long" since he had seen the messages.

¶ 11    On redirect, Ashford stated that he answered the trooper's questions honestly, and that, once at the station, troopers asked "more and different" questions. He reiterated that he was maintaining his innocence but pleading guilty because he thought it was in his best interest.

¶ 12    Acting master sergeant Greg Melzer, of the Illinois State Police, testified that he was on patrol on I-90 around 1:29 p.m. on October 13, 2019, when he noticed a car with a Wisconsin license plate rapidly decrease speed for no apparent reason. In addition, the car twice "needed to apply its brakes to avoid coming up directly on the rear" of the sports utility vehicle in front of it. Melzer curbed the car, which was occupied by two men. As Melzer approached the car on foot, he saw the passenger, whom he identified in court as defendant, shaking and typing a text message along the lines of, "Tell the kids I love them. We got stopped by the police."

¶ 13    Melzer asked the driver, whom he learned was Ashford, to join him in his squad car. Ashford seemed nervous, but he was not hesitant or evasive and answered Melzer's questions fairly consistently and without delay. Melzer checked Ashford's Wisconsin driver's license. Believing it was invalid, he returned to Ashford's car to check defendant's license. Defendant gave Melzer an instructional permit, which Melzer did not believe was a valid license, and stated that he was coming from his aunties' house in Chicago.

¶ 14    Melzer went back to his squad car and then approached Ashford's car a third time. According to Melzer, defendant seemed "exceedingly" nervous and admitted being nervous while they "spoke about a possible warrant that he had that was not enforceable." Melzer told defendant that he was not being arrested based on the warrant.

¶ 15    Believing that neither defendant nor Ashford had a valid license, Melzer arranged to have the car towed. He then performed a tow inventory of the car while Ashford was in the squad car

and defendant stood nearby with another responding trooper. During the search, Melzer noticed a "bulge" in the pocket on the back of the driver's seat. He "was able to pull back the pocket and noted a plastic bag with what appeared to be a controlled substance or a multiple of controlled substances inside." Melzer recovered the bag and placed defendant and Ashford in handcuffs, detaining them for further investigation. In court, he identified a photograph he took of the "pocket with a bulge inside of it," which was admitted into evidence as an exhibit.

¶ 16    Later, at a State police squad room, Melzer looked through Ashford's cell phone. He located a text message conversation between Ashford and someone named "Josh" that he thought might be of evidentiary value pertaining to the drugs. Melzer took a photograph of the conversation, which was admitted into evidence as an exhibit. The photograph depicts a conversation from October 5, 2019, in which Ashford asked, "What up you good bro?" and Josh answered, "Yes sir. How much[?]" to which Ashford replied, "30." Josh's response, asking about "sliding," is partially obscured by glare on the screen, as is the end of Ashford's reply, which begins, "Heading your way[.]"

¶ 17    On cross-examination, Melzer testified that Ashford was nervous throughout their interaction in the squad car, rubbed his head and face, and fidgeted. He issued Ashford a warning for following too closely and a ticket for driving without a valid license. Melzer explained that he told defendant about the unenforceable outstanding warrant for his arrest because it was his normal practice to inform people of such warrants so they can get them "cleared up."

¶ 18    Melzer stated that when he was following Ashford, he was not able to see much inside the car due to the slight amount of tint on the windows and the overcast weather conditions. He did not at any time before or during the stop see defendant make any "furtive movements" or reach

into the back seat. Although the recovered items were sent for forensic analysis, Melzer did not "believe that there was a result as far as the fingerprint analysis went."

¶ 19    On redirect, Melzer testified that while he and Ashford were in the squad car, he had "no idea" what defendant was doing in Ashford's car. He clarified that while he could see defendant's head and shoulders, he could not see defendant's hands or lower body. He also stated that he did not see Ashford make any furtive movements while he was in the car.

¶ 20    Melzer's dashcam video of the stop was admitted into evidence as People's Exhibit No. 9. The video was not published in open court; the trial court indicated it would watch the video *in camera*.

¶ 21    The dashcam video, which is included in the record on appeal and which was viewed by this court, depicts Melzer following Ashford's car, curbing it, and approaching the passenger's side on foot. Indistinct images of the top of Ashford's and defendant's heads can be seen moving in the car through its rear window. Melzer speaks to Ashford and defendant through the passenger-side window, informing them that he pulled them over for following the car ahead of them too closely. He asks Ashford for his license and registration and, after receiving some sort of document, asks Ashford to join him in the front seat of the squad car. Ashford exits his car at approximately 03:42 in the video and follows Melzer to the squad car. Melzer and Ashford then converse in the squad car until about 07:22, when Melzer exits the squad car, explaining that he is going to find out whether defendant has a valid driver's license.

¶ 22    Melzer approaches the passenger side of Ashford's car a second time and asks defendant for identification. When he asks defendant where he and Melzer were coming from, defendant can be heard making an "uh" noise before stating something unintelligible. Melzer responds, "His

auntie's house? All right, cool." They converse until about 08:15, when Melzer says he is going to check the status of defendant's license and walks back to his squad car.

¶ 23 Melzer remains in the squad car, speaking with Ashford and a dispatcher, until about 19:52. During this time, defendant, who is still in the passenger seat of Ashford's car, appears to move his head several times. Melzer then exits the squad car, speaks with a responding officer who is off-screen, and approaches the passenger side of Ashford's car a third time.

¶ 24 Through the passenger-side window, Melzer informs defendant that he has a warrant from southern Illinois that is not extraditable and not valid in northern Illinois. He assures defendant that he is not being taken into custody based on the warrant, asks defendant if he is okay, and states he is just giving defendant a heads up. Around 21:50, Melzer walks back to his squad car. While Melzer is in the squad car, defendant again appears to move his head several times. Melzer eventually receives information from the dispatcher, after which he informs Ashford that neither he nor defendant has a valid driver's license.

¶ 25 Around 32:35, Melzer exits the squad car and tells the other responding officer that Ashford's car will be inventoried. At 33:50, he approaches the passenger side and asks defendant to exit the car. The other officer enters the camera's frame, defendant exits the car, and Melzer explains to him that neither he nor Ashford has a valid license to drive the car. Defendant consents to being patted down by Melzer and then defendant and the other officer exit the camera's frame.

¶ 26 Melzer searches the car for a few minutes. He then walks out of the camera's frame toward defendant and tells him he is being handcuffed because there were "illegal substances" in the car. While off-screen, Melzer gives Ashford similar information. Melzer returns to Ashford's car and

emerges with a bag, which he takes to the squad car. He then continues to search Ashford's car. Eventually, a tow truck arrives and tows Ashford's car from the scene.

¶ 27　The parties stipulated that the suspect heroin recovered from the car weighed 39.7 grams and tested positive for the presence of heroin.

¶ 28　Belvidere detective sergeant Chris Washburn, the supervisor of the Belvidere Boone County Metro Narcotics Unit, was qualified as an expert in drug transactions. Washburn testified that the quantity of the recovered heroin alone was indicative of intent to deliver. He also explained that typically, people conducting drug transactions utilize prepaid phones that are not directly traceable to them. He identified People's Exhibit No. 4, one of the phones recovered during the inventory search of Ashford's car, as a prepaid "dumb phone." On cross-examination, he agreed that many, non-drug-related reasons existed for people to possess prepaid phones.

¶ 29　Defendant made a motion for a directed finding, which the trial court denied. Defendant did not testify or present evidence.

¶ 30　Following closing arguments, the trial court found defendant guilty of PCS with intent to deliver heroin, as well as PCS of heroin, which it stated merged with the more serious count. In its written decision, which it read into the record, the trial court stated that it found Ashford's testimony at trial to be credible, as well as consistent with his statements and behavior in the dashcam video. The court found that Ashford's temperament and tone in the video were "friendly and cooperative," and that his level of anxiety did not appear to be any greater than any other motorist pulled over for a routine traffic offense. The court acknowledged that any time a codefendant testifies against another codefendant in exchange for a reduction in charges, the

testimony should be greeted with suspicion. Nevertheless, the court was "not persuaded that Ashford's testimony was not truthful or believable."

¶ 31    In contrast to Ashford, the court found that defendant "was a bundle of nerves and equivocation" in the video. In particular, the court observed that when Melzer asked defendant where he was coming from, defendant hesitated and said "uh" twice before responding. Noting that it could draw inferences based on the evidence and testimony presented, the court found defendant constructively possessed the drugs where his level of nervousness and evasiveness was evident in the video, he was left alone in the car for a great deal of time, he had ample opportunity to place the drugs in the pouch behind the driver's seat, and the drugs were found mere feet from where he was located. Specifically, the court observed that "at the 8 minute and 49 second mark and the 22 minute and 40 second mark of the video, as Melzer is walking away from the vehicle, you can see what appears to be the Defendant leaning towards the driver's seat of the vehicle," and explained that those instances were but two examples throughout the video where defendant was moving, "however slight."

¶ 32    Defendant filed a posttrial motion, which the trial court denied. The trial court thereafter sentenced defendant to 13 years and 6 months in prison for PCS with intent to deliver. Defendant filed a timely notice of appeal.

¶ 33    On appeal, defendant challenges the sufficiency of the evidence to convict, arguing that the State failed to prove beyond a reasonable doubt that he possessed the recovered drugs.

¶ 34    When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*,

443 U.S. 307, 318-19 (1979). The credibility of the witnesses, the weight to be given their testimony, and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)) or where proof of an element of a crime is wholly lacking (*People v. Sweigart*, 2021 IL App (2d) 180543, ¶ 56).

¶ 35    To sustain a conviction for PCS with intent to deliver, the State must prove, *inter alia*, that the defendant knew of the presence of the controlled substance, that the controlled substance was in his immediate possession or control, and that he intended to deliver the controlled substance. *People v. Crane*, 2020 IL App (3d) 170386, ¶ 30 (citing *People v. Robinson*, 167 Ill. 2d 397, 407 (1995)). In the instant case, defendant only disputes the element of possession. As such, the relevant inquiry in this appeal is whether the State proved he possessed the heroin recovered from Ashford's car.

¶ 36    Defendant argues that the State failed to prove possession where no one saw him touch the drugs or reach into the back seat, he did not admit the drugs were his, and there were no fingerprints or other physical evidence connecting him to the drugs. He points out that Ashford, who owned and was driving the car in which the drugs were found, pled guilty to possessing the drugs and had a cell phone that contained text messages about purchasing drugs. In addition, defendant argues that Ashford, in light of his guilty plea, should be considered an accomplice, and, as such, his testimony denying ownership of the drugs is inherently suspect and should be scrutinized carefully. Defendant concludes that his conviction must be reversed where there was nothing connecting him

to the drugs aside from his mere presence in the car, which he maintains is insufficient as a matter of law.

¶ 37    The State responds that it proved constructive possession of the drugs where there were only two people in the car, only defendant and Ashford had access to the car's inner compartment, the drugs were found in an area within defendant's reach, and Ashford and Melzer "provided testimony *** that could link defendant to the contraband." The State further asserts that the dashcam video depicts "defendant leaning towards the driver's seat and making other movements while he was alone in the car," and notes that Ashford, whom the trial court found credible, testified that no drugs were in his car prior to defendant entering it and that the prepaid phone recovered from his car belonged to defendant. Finally, the State asserts that defendant's nervous behaviors during the stop, including typing a text message to tell his kids he loved them, were indicative of consciousness of guilt.

¶ 38    Where, as here, a defendant is not found in actual physical possession of contraband, the State must prove that he had constructive possession. *People v. Walker*, 2020 IL App (1st) 162305, ¶ 20.[2] Constructive possession is almost always proved by circumstantial evidence. *Id.* To establish constructive possession, the State is required to prove both that a defendant had knowledge of the presence of contraband and that he exercised immediate and exclusive control over the area where it was found. *Id.*

---

[2]The doctrine of constructive possession applies collectively to controlled substances and weapons as "contraband." *People v. Hunter*, 2013 IL 114100, ¶ 19; see also *People v. Williams*, 98 Ill. App. 3d 844, 847 (1981) ("The doctrine of constructive possession, usually found in narcotics cases[, is] equally applicable to possession of unlawful weapons").

¶ 39     When there is no direct evidence of knowledge of contraband in a car, reviewing courts look to four factors, derived from *People v. Davis*, 50 Ill. App. 3d 163 (1977), and cited in *People v. Bailey*, 333 Ill. App. 3d 888 (2002), to determine whether the State presented sufficient circumstantial evidence from which the defendant's knowledge may reasonably be inferred. *People v. Hampton*, 358 Ill. App. 3d 1029, 1033 (2005). The *Bailey* factors are: (1) the visibility of the contraband from the defendant's position in the car; (2) the period of time in which the defendant had an opportunity to observe the contraband; (3) any gestures by the defendant indicating an effort to retrieve or hide the contraband; and (4) the size of the contraband. *Bailey*, 333 Ill. App. 3d at 891-92. The State cannot rely on a defendant's mere presence to establish knowledge that a controlled substance is in a vehicle. *People v. Horn*, 2021 IL App (2d) 190190, ¶ 40; *People v. Ingram*, 389 Ill. App. 3d 897, 900 (2009). An application of the *Bailey* factors in the instant case leads us to conclude that the State failed to present sufficient circumstantial evidence for a trier of fact to have made a reasonable inference of knowledge of the presence of the contraband.

¶ 40     As to the first *Bailey* factor, the bag of drugs was fully concealed in the pocket behind the driver's seat when Melzer discovered it. It was not in a location where it would have been in plain view from defendant's position in the front passenger seat.

¶ 41     The second *Bailey* factor, the length of time defendant had to observe the contraband, cuts somewhat in the State's favor. Defendant could have observed the "bulge" in the pocket behind the driver's seat at any time during the drive from the east side of Chicago to the Belvidere area of I-90 where Melzer stopped Ashford, as well as during the stop. However, because the bag of drugs

was completely concealed within the pocket, it was the "bulge," not the drugs, that was observable. As such, we do not find this factor conclusive.

¶ 42    Regarding the third factor, Ashford testified that he never saw defendant enter or reach into the back seat, and Melzer testified that he did not see defendant make any furtive movements or reach into the back seat. Although the trial court found that the dashcam video depicted defendant leaning towards the driver's seat at least twice, it also characterized those movements as "slight." We have carefully reviewed the video and, while we agree that it depicts defendant's head moving, we cannot say it shows defendant reaching into the back seat or making any furtive movements.

¶ 43    Lastly, the fourth factor, the size of the contraband, does not support an inference that defendant knew the drugs were present as the bag of drugs was small enough to be completely concealed inside the driver's seat pocket.

¶ 44    Having considered the *Bailey* factors, we conclude that in this case, the State failed to present sufficient evidence that defendant had knowledge of the presence of the bag of drugs so as to establish constructive possession. All the State proved in this case was that defendant was present in the car where the drugs were found from the time he and Ashford left Chicago to the time Melzer had him step out of the car. As noted above, mere presence in a car where contraband is found is not enough to establish an inference of knowledge. See, *e.g.*, *Horn*, 2021 IL App (2d) 190190, ¶ 40. In light of our finding of insufficient evidence of knowledge to establish constructive possession, we need not consider whether the State proved that defendant exercised immediate and exclusive control over the area in which the drugs were found.

¶ 45    We briefly note the State's arguments that defendant was nervous during the stop, that Ashford identified the prepaid phone found in his car as defendant's, and that the trial court found

Ashford's testimony credible. None of these circumstances change our analysis. First, while nervousness is a factor that may weigh in favor of a finding of knowledge, it is not by itself sufficient to uphold a finding of knowledge. *People v. Ortiz*, 196 Ill. 2d 236, 266-67 (2001). Here, the record presents another potential reason for defendant's nervousness: Melzer testified that defendant admitted being nervous while they "spoke about a possible warrant that he had that was not enforceable."

¶ 46 Second, even accepting, as Washburn testified, that some people involved in drug transactions possess prepaid phones, and that, as Ashford testified, the prepaid phone found in his car belonged to defendant, the evidence at trial failed to establish that defendant possessed that phone in furtherance of a drug transaction. Any conclusion that defendant had knowledge of the heroin based on his possession of a prepaid phone is speculation. See *Ortiz*, 196 Ill. 2d at 266 (rejecting argument that knowledge of presence of drugs should be imputed to a defendant based on the presence of two pagers in the truck he was driving). Although a reviewing court must allow all reasonable inferences from the record in favor of the prosecution, a reviewing court may not allow unreasonable or speculative inferences. *People v. Cunningham*, 212 Ill. 2d 274, 280 (1984); *Crane*, 2020 IL App (3d) 170386, ¶ 29.

¶ 47 As for the trial court's finding that Ashford was credible, we are mindful that under the reasonable doubt standard, it is not our function to retry defendant or reweigh the evidence. See, *e.g.*, *People v. Radford*, 2018 IL App (3d) 140404, ¶ 30. However, "merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision" (*People v. Ross*, 229 Ill. 2d 255, 272 (2008)), and the fact that a judge "did accept testimony does not guarantee it was reasonable to do so"

(*Cunningham*, 212 Ill. 2d at 280). As the trial court acknowledged in this case, the testimony of an accomplice should be viewed with suspicion and accepted only with great caution, especially where, as here, he was promised leniency. See *People v. Zambrano*, 2016 IL App (3d) 140178, ¶ 27. Moreover, even accepting Ashford's testimony, we note that he did not testify he saw defendant possessing the drugs at any time, or even reaching into the back seat. Rather, Ashford merely suggested at trial that defendant must have placed the bag of drugs in the pocket behind the driver's seat during the stop because "How else did it get in there?" Ashford's testimony was speculative and does not support a finding that defendant had knowledge of the presence of the bag of drugs in the pocket behind the driver's seat of Ashford's car.

¶ 48     In summary, the State failed to prove beyond a reasonable doubt that defendant had knowledge of the presence of the heroin in the car in which he was a passenger. As such, the evidence was insufficient to establish constructive possession of the drugs, and, because proof of an element of the crime is wholly lacking, we must reverse defendant's conviction for PCS with intent to deliver.

¶ 49     For the reasons explained above, we reverse defendant's conviction.

¶ 50     Reversed.