2025 IL App (2d) 240671-U
No. 2-24-0671
Order filed November 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1005 |
| JOSHUA A. SCHAG, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Birkett and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Defendant received a fair and adequate opportunity to confront and examine M.P. in his case-in-chief, after he had ample opportunity to cross-examine M.P. during the State's case-in-chief; (2) Defendant was not prejudiced by having to make an offer of proof as to M.P.'s testimony in his case-in-chief after the State objected to her being called as a witness; (3) M.P. did not testify to the date of the alleged incident, and even if she had, the date of the alleged incident is not an essential element of the charged offenses; and (4) Defendant was proven guilty beyond a reasonable doubt where M.P. testified credibly regarding the alleged incident.

¶ 2    Defendant, Joshua A. Schag was found guilty of four counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2020)), and three counts of aggravated sexual abuse (720 ILCS 5/11- after a bench trial. He appeals his convictions. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On June 4, 2021, defendant was charged with four counts of criminal sexual assault (720 ILCS 5/11-1.20(a)(3) (West 2020)), and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2020)). The alleged victim was defendant's daughter, M.P., who was a minor at the time of the incident. On July 19, 2021, a grand jury indicted defendant on those charges, as well as an additional two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2020)).

¶ 5    On April 17, 2021, defendant filed a motion for an independent evaluation of M.P., seeking to have her evaluated by his own expert due to her "emotional instability." The trial court apparently held a hearing on the motion on April 24, 2021, but the transcript was not included in the record on appeal. The trial court denied the motion.

¶ 6    Prior to trial, defendant also filed a motion *in limine* seeking to clarify the period of time that the alleged acts occurred. After brief argument, the motion was denied. Defendant also made an oral motion to exclude "all witnesses *** in light of the relationships between the victim, the victim's mother, and the people in the courtroom for purposes of [*ex parte*] communications not in the presence of counsel." When the trial court inquired further, defendant clarified he was seeking to exclude people who were not going to testify in the case. The trial court stated that "[t]his is an open courtroom. *** So unless they're a witness testifying in the case, they are not excluded from the courtroom." Defendant later withdrew his motion to exclude. During the State's opening statement, the State made an oral motion to exclude, which was granted.

¶ 7    The matter proceeded to trial on December 18, 2023. Before the State called its first witness, the trial court addressed an issue involving Heidi Slocum, M.P.'s maternal grandmother. Heidi was present to support M.P. However, pursuant to defendant's third-amended witness disclosures filed same day as trial, defendant served her with a subpoena minutes before M.P. was called to testify. The trial court ultimately allowed Heidi in the courtroom during M.P.'s testimony, noting that in defendant's most recent witness disclosures, defendant had not included any information as to what Heidi would testify about, as required by Illinois Supreme Court Rule 413(d)(i). The trial court also noted that defendant's strategy seemed "a shotgun approach to try and keep people out of the courtroom during testimony."

¶ 8    M.P. was called as the State's first witness. She testified as follows. M.P.'s date of birth is August 2, 2005. At the time of the trial, M.P. was 18 years old. Her father is the defendant, Joshua Schag, and she has not seen him in approximately four years. When she was younger, she would stay overnight with defendant at his home in South Elgin every other weekend. Generally, her younger brother J.S. would also stay overnight.

¶ 9    In the summer when M.P. was 12, the incident underlying defendant's criminal charges occurred. M.P. explained that she had previously told an investigator at the Child Advocacy Center that she was either 12 or 13 when the incident occurred. Upon further reflection, she remembered that it actually occurred the summer she was 12. She remembered this because the weather was nice enough to go swimming. The incident occurred on one of her regular weekend visits with defendant.

¶ 10    The day of the incident, M.P., defendant, and J.S., went swimming. J.S. then left to go to a friend's house to sleep over. At this point, M.P. and defendant were alone in the house together. Defendant had been drinking and doing drugs throughout the day. Defendant had drunk a lot more

than he usually would on a weekend M.P. was there, though M.P. had not counted the exact number of drinks he had.

¶ 11    M.P. showered, put on pajamas, and then went to the living room to watch television on the couch with defendant. She mentioned to defendant that she was sore from cheerleading. Defendant then began to massage M.P.'s shoulders. He began to move his hands lower and towards the front of M.P.'s body. She pulled away slightly, and defendant moved his hands back to her shoulders. However, he continued to move his hands lower and towards the front of M.P.'s body, eventually touching the side of one of her breasts. M.P. then went to bed because she felt uncomfortable.

¶ 12    M.P.'s bedroom was on the main floor of the house. It had a "bunk bed-type thing with no bottom bunk." She went to bed on the top bunk. She was trying to fall asleep but could not because she was uncomfortable due to the incident that occurred while watching television. At some point, a figure entered the room. It was dark, but she could see a shadowy figure enter the room. The figure climbed up the ladder to the bunk bed, which brought the figure up to the end of the bed where M.P.'s feet were. The figure pulled M.P.'s pants and underwear halfway down her legs. M.P. assumed the figure was defendant, as he was the only other person in the house.

¶ 13    The figure then mumbled. M.P. recognized this mumbling to be defendant. Defendant then began to use his hands to touch M.P.'s vagina. He also used his mouth to touch the inside of her vagina. M.P. could not recall how long this went on for. She eventually was able to shift her body, which startled defendant. He stopped touching her vagina, began to mumble, and then left. M.P. knew he had left because she heard the floors creak.

¶ 14    M.P. then attempted to fall asleep. However, defendant returned. He again climbed the ladder to the bunk bed, removed M.P.'s pants and underwear, and began to touch her vagina with

his hands and mouth. M.P. shifted to her side to lay on her shoulder, which stopped the interaction. Defendant again left the room.

¶ 15     After the incident, M.P. continued overnight visitation with defendant. The last time she went to stay overnight was when she was 13 years old. The Friday night when she arrived, she was yelled at for trying to do her homework in her bedroom because her sister, brother, and two other children were playing there. Defendant was also drinking heavily that night.

¶ 16     M.P. began to text her mother about her frustration with not being able to do her homework. At some point in the text conversation, her mother told her to contact the authorities. M.P. responded that she was too scared, as defendant had been drinking. M.P.'s mother then contacted the authorities and they came to the house. M.P. did not stay with defendant. Her grandparents came and picked her up.

¶ 17     M.P. did not tell anyone about the incident until a few months later when she told her grandmother. M.P. was 12 years old at the time she told her grandmother. The next person M.P. told was her mother, while M.P. was staying at a mental health facility in Forest Park due to multiple suicide attempts. M.P. telling her mother ultimately led to the charges in the instant case being filed. M.P. spoke with the authorities and underwent an interview and a medical examination at the Child Advocacy Center. M.P. came forward with these allegations because she did not want the same thing to happen to her little sister.

¶ 18     On cross-examination, M.P. testified as follows. The last time she saw defendant was four years ago, in 2019. Defendant took her and a friend to a "meet and greet concert" the weekend of August 2nd or 3rd. M.P. did not stay the night with defendant that weekend. The last night M.P. stayed over with defendant would have been the weekend of July 20th. This is the weekend the police came.

¶ 19    Regarding the night of the incident, M.P. testified that defendant had drunk more than usual. Usually, he would consume "maybe a six-pack" but the day of the incident, he had consumed most of a 24-pack of beer. He had started drinking around 11:30 a.m.

¶ 20    M.P. again testified regarding the details of the incident. Her testimony on cross-examination was largely similar to her testimony on direct examination (see *supra* ¶¶ 12-13). Her father had a tongue ring at the time of the incident. That was another reason she knew it was defendant; she felt his tongue ring when he was licking her vaginal area.

¶ 21    The first person M.P. told of the incident was her grandmother. Then, she told some other children at the hospital. Lastly, she told her mother.

¶ 22    On re-direct examination, M.P. again clarified that she did not know the exact date that the incident occurred. Further, she only testified regarding the July 20th date because that was the date that the defense attorney had provided to her during cross-examination. She does not have independent recollection of that date herself.

¶ 23    The State called Jennifer Slocum, M.P.'s mother, as their next witness. She testified as follows. M.P. was born August 2, 2005. Defendant is M.P.'s father. Jennifer never lived with defendant, but M.P. had a set visitation schedule. M.P. would visit defendant from 4:00 p.m. to 7:00 p.m. on Tuesday and Wednesday and every other weekend and holiday. She stopped visiting with defendant in the eighth grade. Prior to visitations ending entirely, M.P. would get into arguments with Jennifer because she did not want to visit with defendant. When this would happen, defendant would call the police. However, since M.P. stopped visiting defendant entirely, defendant had not attempted to contact the police or otherwise attempted to enforce his visitation rights. He "disappeared."

¶ 24    There was an incident where Jennifer contacted the police while M.P. was visiting with defendant. She believes that was the last time M.P. visited with defendant.

¶ 25    On cross-examination, Jennifer testified that one of the last visits M.P. had with defendant was in August of 2019 when defendant took M.P. and her friend to a "Tik Tok meet and greet." Jennifer believes that the last time M.P. visited defendant was the incident where the police were called. She is not sure of the exact date of M.P.'s last visit with defendant.

¶ 26    Next, Beth Mullarkey, an investigator at the Kane County Child Advocacy Center, testified as follows. Mullarkey lead the investigation involving defendant. On June 1, 2021, she interviewed defendant. When she asked him about the allegations made by M.P., he responded that he 100% did not do it. She also questioned him about J.S. sleeping over at other people's houses while he watched him. Defendant responded that he recalled a couple times that J.S. would sleep over at a neighbor's house. This line of questioning from the interview was audio recorded. The recording was entered into evidence as People's Exhibit no. 1, but was not included in the record on appeal.

¶ 27    Also during the interview on June 1, 2021, Mullarkey asked defendant if alcohol consumption could have impacted his ability to recall the events. He continued to deny doing anything to his daughter, M.P. This line of questioning from the interview was audio recorded. The recording was entered into evidence as People's Exhibit no. 2, but was not included in the record on appeal.

¶ 28    On cross-examination, defense counsel asked Mullarkey if defendant had maintained his innocence throughout the entire interview. She confirmed that he had.

¶ 29    The matter concluded for the day and the trial was continued to December 19, 2023. Shannon Krueger, director and pediatric nurse practitioner at the UIC MERIT Clinic (University of Illinois Chicago Medical Evaluation and Response Initiative Team Clinic), was called as the

State's next witness. MERIT is a program that specializes in child abuse. After *voir dire*, Krueger was qualified as an expert in the field of child sexual abuse and child sexual assault examinations. She testified as follows. She conducted an exam on M.P. on June 8, 2021, pursuant to a referral from the Kane County Child Advocacy Center. During the exam, M.P. disclosed that her father had sexually abused her approximately three years prior.

¶ 30    Krueger continued on with the physical examination. M.P. had a normal genital exam, but her anal exam showed an anal fissure. Krueger concluded the anal fissure was a result of recent constipation, not related to the sexual assault. Ultimately, the fact that M.P. had a normal genital exam was not unusual, as most children who disclose sexual abuse will have normal exams.

¶ 31    Kreuger also testified that victims of sexual abuse are at a higher risk for substance abuse, suicide or suicidal ideation, highly sexualized behaviors, obesity, mental health disorders (such as PTSD, depression, anxiety, bipolar), trouble sleeping, high blood pressure, and certain cancers. Of those behaviors, M.P. engaged in substance abuse and suicide attempts. She was also diagnosed with PTSD and bipolar and had trouble falling asleep. During the exam, M.P. indicated that she had a significant fear of her father.

¶ 32    On cross-examination, Kreuger testified that M.P. told her the abuse happened when she was "around 12 years old," which would be "in the area of 2017." She also testified that although suicidal ideation, substance abuse, and trouble sleeping are common behavioral patterns in children that are sexually abused, those behaviors are not always connected with abuse.

¶ 33    Next, Robert Wittenauer, a Village of South Elgin police officer, testified as follows. On December 7, 2018, at approximately 7:16 p.m., he was on duty. He responded to a welfare check at defendant's home in South Elgin. Upon arrival, Wittenauer spoke with M.P., who indicated she was uncomfortable being at defendant's home because she thought he was intoxicated. Wittenauer

also spoke with defendant, who admitted to smoking cannabis. Wittenauer indicated he did not believe defendant to be intoxicated but could smell the odor of cannabis coming from inside the residence. Defendant then permitted M.P. to be picked up by her grandparents. M.P. did not stay the night at defendant's residence.

¶ 34    The matter concluded for the day and the trial was continued until March 13, 2024. The State called H.N.T., defendant's sister, as their next witness. She testified as follows. When she was 12 or 13 years old, defendant on several occasions came into her room while she was asleep and touched her breasts and vaginal area. H.N.T told her mother about the incidents when she was 15, but the authorities were never notified.

¶ 35    Regarding the instant case, H.N.T testified that defendant had contacted her in May 2021. He apologized for what he had done to H.N.T and told her that he was upset he had done it. Defendant also asked H.N.T if she was contacted regarding the incidents in the investigation involving his daughter, what her response would be. H.N.T told him that she would tell the truth.

¶ 36    The State rested. Defendant filed a motion to dismiss and a motion for mistrial. The motions were substantially the same. In them, he argued that prior to trial, the State should have disclosed the fact that M.P. first told her grandmother[1] about the incident when she was 12 (see *supra* ¶ 17). Further, defendant argued that the fact that Heidi Slocum remained in the courtroom during M.P.'s testimony was prejudicial to him. After arguments from both parties, the trial court denied both motions. Then, after prompting from the State, defendant made an oral motion for a

---

[1] Throughout the motion to dismiss and motion for mistrial, defendant incorrectly assumes that the grandmother referenced by M.P. was Heidi Slocum. This was not based on M.P.'s testimony. She only refers generically to her grandmother. It is later revealed that M.P. was referring to her paternal grandmother, Donna.

directed finding, arguing, among other things, that M.P.'s testimony was contradictory and insufficient to prove defendant guilty. The trial court also denied this motion.

¶ 37    Defendant then proceeded with his case-in-chief. He called Beth Mullarkey, an investigator at the Kane County Child Advocacy Center, as his first witness. She testified as follows. She was the lead investigator in the investigation into defendant. She viewed the forensic interview, arranged for other interviews, collected evidence, wrote reports, spoke with those involved in the case, and coordinated with the State's attorney. She conducted the interview of defendant, along with one other investigator, Investigator Bosshart. She did not interview defendant's son, J.S., nor defendant's girlfriend, Sonia. She also testified before the grand jury on July 16, 2021.

¶ 38    Mullarkey also interviewed Jennifer Slocum, M.P.'s mother, on December 15, 2021, and on May 17, 2022. Mullarkey indicated that Slocum told her about M.P.'s suicide attempts. In the December 15, 2021, interview, Slocum stated that the last time M.P. had visitation with defendant was August 2016. In the May 17, 2022, interview, Slocum indicated that the last time M.P. had visitation with defendant was August 2019. Mullarkey was not able to independently recollect either of those dates. Her recollection had to be refreshed using the reports from those interviews.

¶ 39    Mullarkey testified that in reviewing M.P.'s medical records, she became aware that M.P. was hospitalized. When Mullarkey was asked if M.P.'s hospitalizations were a result of the alleged sexual abuse, she responded that they were not.

¶ 40    On cross-examination, Mullarkey clarified that M.P.'s hospitalizations were not the result of injuries sustained during sexual abuse. M.P. was not hospitalized on an emergency basis because she had been raped or assaulted.

¶ 41    She also clarified that in the December 15, 2021, interview, it was a typo when she wrote that the last time M.P. had visitation with defendant was August 2016. The date was actually August 2019.

¶ 42    Sonia Bolivar, defendant's girlfriend, was called as the next witness. She testified as follows. She has lived with defendant in South Elgin since April 2019. When Sonia first moved in, M.P. had visitation with defendant every other weekend, as well as Tuesdays and Wednesdays during the week. J.S., defendant's son, was also on the same visitation schedule as M.P. When the children would stay over, she and defendant would share a room on the main floor and M.P. and J.S. each had their own room on the main floor. The rooms were very close together, to the point that Sonia "could touch [her] door and [M.P.'s] door, if needed." M.P. never visited the house when Sonia was not present. Sonia was there for every weekend visitation. M.P.'s last visitation with defendant was in August 2019. During the period between April 2019 and August 2019, there was never a time that defendant got up from their bedroom and left in the middle of the night. Also, during that time, there was never a time that she and defendant would go to sleep before M.P. and J.S. They would always go to bed around the same time.

¶ 43    Sonia also testified regarding the layout of the home. Of note, she testified that in the hallway leading to M.P.'s bedroom, there were no sources of light other than the overhead light, which was turned off each night.

¶ 44    Sonia testified that defendant drinks beer, but not hard liquor. He also smokes marijuana every day. She and the defendant have had sexual relations, and there has never been a time he didn't remember having sexual relations with her the next morning. They would talk about it the next day.

¶ 45    On cross-examination, Sonia testified that while she knew M.P. had made allegations that defendant came into her bedroom and did something to her, Sonia did not know the specifics of the allegations. Defendant also told her about the abuse against his sister, but Sonia could not recall when he told her. Sonia is still in a relationship with defendant.

¶ 46    Next, defendant called J.S., defendant's son and M.P.'s brother, as a witness. He testified as follows. He does not know what happened between defendant and M.P. He has lived full time with defendant and Sonia in South Elgin for under a year. The first time they met Sonia was when she picked them up from the airport when they were coming home from their grandma's funeral. Currently, M.P. does not have visitation with defendant anymore and the last time J.S. spoke to M.P. was summer 2022. When J.S. did not live with defendant, he had visitation with him every weekend. Whenever he had visitation, M.P. was also present. There was never a weekend that M.P. had visitation and J.S. was not present. J.S. sometimes stayed the night at the neighbor's house, though he hadn't done that in about two years.

¶ 47    J.S. also testified regarding M.P.'s bedroom. He testified that the bunk bed in his sister's room was a bed on top of a "fort" with two windows and a door. They weren't held in place too well, so the bed would "jiggle and shake," especially when climbing on and off the bed. Regarding the house overall, J.S. testified that the floors would make noise anytime someone walked.

¶ 48    Defendant called M.P. as his next witness. The State objected and requested an offer of proof. Defense counsel stated the following:

    "[W]e would intend to call the witness and have her talk about *** the fact that [M.P.]'s brought forth with this court indicating that her father *** drank approximately 20 *** cans of beer, was smoking marijuana, entered her room in the middle of the night

in that state and walked up and down the bunk bed on two occasions and sexually abused her.

Much of her testimony during her testimony is contradictory to the things that she said in one statement and things that she said in a different statement.

*** 

There's issues with regard to her -- the reports indicate that she had three suicide attempts. She only -- She referred to I believe one, possibly two, but there was a third. There's incidents in terms of her calling the police on December 7th of 2018 regarding wanting to go home to work on homework. And when the police came, she left with her grandmother and, in fact, indicated that her father was inebriated and smoking marijuana, but that was not the case as the police officer indicated when he testified that he did not – that Mr. Schag was not inebriated or under the influence of anything.

I'd like to go through the exhibits with her as well, your Honor, with regard to her room and the hallway because her testimony is, in fact, that she -- there was moonlight -- that she was able to see, the shadow of the defendant. She talks about there being a light in the hallway. I'd like to show her the picture with regard to the hallway and have her tell me where the lights are.

She talked about talking to her grandmother yesterday. There was a lot that came up in terms of that she has another grandmother. I would like to ask her where she was when, in fact, her grandmother died – when Mr. Schag's mother, her grandmother, died and in terms of where she was. The evidence will show that she went to the funeral with her mother in Las Vegas, Nevada, and that happened prior to *** when we believe this alleged incident occurred."

¶ 49    The trial court ultimately allowed M.P. to take the stand and testify regarding her grandmother and her funeral, and her Instagram posts. All other areas were either subject to cross-examination during the State's case in chief, or not relevant.

¶ 50    M.P. then testified as follows. The night the police were called, she was frustrated at not being able to do her homework and she did not feel safe, which is why she left.

¶ 51    Regarding the alleged incident, the first person she told was her paternal grandmother, Donna Jax. She told her a few months after the alleged incident occurred.

¶ 52    After the incident, M.P. had some contact with defendant via text message. Defense counsel inquired about a number of communications occurring in July 2020, December 2020, February 2021, and December 2022. M.P. denied contacting defendant on those occasions.

¶ 53    Next, Jennifer Slocum, M.P.'s mother, was called as a witness. She testified as follows. The last time M.P. saw defendant was in 2018. When defense counsel asked her about the concert defendant took M.P. to, she responded that she believed the concert took place in August 2018. She also believed M.P.'s paternal grandmother died in March 2018, but she was not sure of the year. When she and M.P. flew out to Las Vegas for the funeral, they stayed with defendant's sister, H.N.T.

¶ 54    The defense rested. Before closing arguments, the parties stipulated to the following:

"That if Amanda Glaesmer was called as a witness at the trial of the above captioned matter, she would testify as follows:

1.    That she is an investigator employed by the Department of Children and Family Services.

2.    That she was so employed on June 4, 2021, and interviewed [J.S.] at his mother's residence in Elgin on that date.

3.      That Ms. Glaesmer asked [J.S.] questions about alcohol and that [J.S.] told Ms. Glaesmer he saw his dad drink a lot of alcohol on the fourth of July.

4.      That Ms. Glaesmer asked [J.S.] questions about sleeping over at his friend named Caden's house, and that [J.S.] told Ms. Glaesmer that he slept over at Caden's house a couple of years prior to that interview on June 4, 2021."

The stipulation was admitted into evidence as State's Exhibit no. 7.

¶ 55    After closing arguments from both parties, the trial court found defendant guilty of all counts. On October 11, 2024, the trial court sentenced defendant to four years each on counts one, two, three, and four; three years on count five. Each sentence to run consecutively for a total of 19 years. Counts six and seven merged with counts one and two. Defendant filed his timely notice of appeal on October 31, 2024.

¶ 56                                II. ANALYSIS

¶ 57    On appeal, defendant argues that (1) he did not get a fair and adequate opportunity to confront and examine M.P. in his case-in-chief; (2) he was prejudiced by having to tell the trial court of all areas he intended to inquire of M.P.; (3) M.P. testified to the date of the alleged incident; and (4) he was not proven guilty beyond a reasonable doubt. Each of these arguments will be addressed in turn, but ultimately, none are persuasive.

¶ 58    At the outset, we note defendant's brief violates several Supreme Court rules. He fails to provide a standard of review for each issue, as required by Illinois Supreme Court Rule 341(h)(3), instead, broadly claiming that *de novo* review applies to all arguments. Also, his citations to the record are violative of Illinois Supreme Court Rule 341(h)(6). Additionally, throughout his brief, defendant cited to virtually no authority in support of his arguments in violation of Illinois Supreme Court Rule 341(h)(7)—throughout the entirety of defendant's 31-page argument, he cited to only

- 15 -

11 cases. "The appellate court is not merely a repository into which the appellant may dump the burden of argument and research." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459.

¶ 59    Defendant first argues that he did not get a fair and adequate opportunity to confront and examine M.P. in his case-in-chief, and thus his confrontation, procedural due process, and equal protection rights were violated. In support of this, defendant claims that (1) the trial court allowed Heidi Slocum, a subpoenaed witness, in the courtroom during M.P.'s testimony; (2) the trial court treated Mullarkey and Slocum differently than M.P. in defendant's case-in-chief; and (3) the trial court "restrict[ed][defendant] to merely cross examining M.P."

¶ 60    Our review of challenges under the confrontation clause is *de novo*. *People v. Martin*, 408 Ill. App. 3d 891, 894. "The essential purpose of the confrontation clause is to secure the defendant's opportunity for cross-examination." *People v. Prevo*, 302 Ill.App.3d 1038, 1047. "The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *People v. Hampton*, 387 Ill. App. 3d 206, 214. Further, it is well established that a criminal defendant's right to due process and a fundamentally fair trial includes the right to present witnesses on his or her own behalf. *People v. Corral*, 2019 IL App (1st) 171501, ¶104.

¶ 61    Defendant first contends that allowing Heidi Slocum, M.P.'s maternal grandmother, in the courtroom during M.P.'s testimony, prejudiced him. We fail to see how this would amount to a violation of his confrontation, procedural due process, or equal protection rights. Also, defendant failed to support this argument with relevant case law. He has forfeited review of this issue. See *People v. Urdiales*, 225 Ill. 2d 354, 419-420. Even if we were to overlook forfeiture, it is clear that defendant invited this error by withdrawing his motion to exclude witnesses (see *supra* ¶ 6). "It is well settled under the doctrine of invited error that a defendant cannot request to proceed in one

manner in the trial court and later assert on appeal that the course of action was erroneous." *People v. Moore*, 2021 IL App (2d) 200407, ¶ 33 (citing *People v. Carter*, 208 Ill.2d 309, 319). Defendant withdrew his motion to exclude and made no formal objection on the record to the trial court allowing Heidi Slocum in the courtroom. Accordingly, he acquiesced to her presence and cannot now claim error related to her presence in the courtroom on appeal.

¶ 62    Turning now to defendant's second claim—that the trial court treated Mullarkey and Slocum differently. Defendant contends the fact that "[t]he Trial Court had no issue with Mullarkey or Slocum being called as a witness in both the State's and [defendant]'s case in chief [*sic*], and did not make the [defendant] reveal the nature of the [defendant]'s inquiry to either Mullarkey or Slocum as a condition precedent to them testifying" means the trial court violated his equal protection rights. Notably, he does not provide any support for this claim. Regardless, we find no error in the trial court treating Mullarkey and Slocum differently. M.P. was the victim in the case. Mullarkey and Slocum were not. The Illinois Constitution guarantees crime victims "[t]he right to be treated with fairness and respect for their dignity and privacy and to be free from harassment, intimidation, and abuse throughout the criminal justice process." Ill. Const. Art. 1, § 8.1. Additionally, defendant fails to acknowledge that the State objected and requested the offer of proof prior to M.P. taking the stand in defendant's case-in-chief. The State did not similarly object prior to Mullarkey and Slocum testifying. We find no issue with the differential treatment of M.P. and Mullarkey and Slocum.

¶ 63    Regarding defendant's claim that the trial court "restrict[ed] [him] to merely cross examining M.P."—this claim is patently false. Defendant goes on to state that "[a]llowing the [defendant], the opportunity to call M.P. in the [defendant]'s case as the [defendant]'s witness, would have allowed the [defendant] the opportunity to redirect M.P. after the State's cross

examination of M.P." This statement clearly ignores the fact that defendant *did* call M.P. in his case-in-chief, and only did not have the opportunity to redirect M.P. because the State did not cross-examine her. Defendant's blatant mischaracterization of the record is concerning. As the trial court did not merely restrict defendant to cross-examining M.P., we reject this argument.

¶ 64    We also disagree with defendant's second argument, that he was prejudiced by having to tell the trial court of all areas he intended to inquire of M.P. Apparently, what defendant takes issue with is the trial court having him make an offer of proof. "It is well recognized that the key to saving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court." *People v. Andrews*, 146 Ill. 2d 413, 420-21. "The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper." *Id.* at 421.

¶ 65    Defendant notes all the areas he wished to inquire of M.P. These areas include: M.P.'s testimony regarding whether or not her eyes were shut during the incident, M.P.'s testimony regarding defendant's tongue ring, M.P.'s testimony regarding the touching of her breast, M.P.'s testimony regarding how defendant climbed up and down the ladder of the bunk bed, M.P.'s response to Sonia Bolivar and J.S.'s testimony that they were home during the time the alleged incident occurred, and M.P.'s suicide attempts. The point defendant seems to miss is that he had the opportunity to ask M.P. about all of these areas during his vigorous cross-examination. The defendant states that "[t]he Trial Court should not be allowed to dictate the nature of the inquiry of the [defendant] as long as the inquiry is proper, and does not violate any rules of evidence." He offers no case law to support this statement. We disagree that defendant was prejudiced by having to make an offer of proof before calling M.P. as a witness in his case-in-chief. And again, defendant

failed to meaningfully support this argument with relevant case law. Accordingly, defendant has forfeited this argument on appeal. See *Urdiales*, 225 Ill. 2d at 419-420.

¶ 66     We note that defendant goes to great lengths to emphasize the fact "[i]t was never established if the [defendant] had a tongue ring," and argues that this fact somehow exculpates him. On the contrary, counsel himself established that defendant had a tongue ring. On cross-examination, counsel asked M.P. the following: "Isn't it true that your dad has had a tongue ring since prior to your birth?" M.P. responded in the affirmative. Questions on cross-examination are required to have a good faith basis. As such, defense counsel's question operated as a judicial admission of the fact that defendant had a tongue ring. See *Lowe v. Kang*, 167 Ill. App. 3d 772, 776 ("Judicial admissions are formal acts of a party or his attorney in court, dispensing with proof of a fact claimed to be true, and are used as a substitute for legal evidence at trial.").

¶ 67     Defendant also confusingly makes an equal protection argument, claiming that his equal protection rights were violated by requiring him to make an offer of proof prior to M.P.'s testimony. He seems to imply that the equal rights violation stems from "[a] different standard [being] applied to deal with Mullarkey and Slocum." However, he does not offer any real support for this argument, merely stating that "Equal Protection requires that similarly situated persons be treated in a similar manner. [Citation.]" While this may be true, defendant offers no argument as to whom he is similarly situated to and how he is being treated in a dissimilar manner. As his equal protection argument is unsupported by any relevant law, he has forfeited it. See *Urdiales*, 225 Ill. 2d at 419-420.

¶ 68     We turn now to defendant's third argument—that M.P. testified to the date of the alleged incident. We fail to see how M.P,'s testifying to the date of the alleged incident amounts to reversible error. As the State points out in its brief, the State is generally "not required to prove

that a particular crime was committed on a particular date, unless the allegation of a particular time is an essential element of the offense." *People v. Suter*, 292 Ill. App. 3d 358, 363. Here, the allegation of a particular time is not an essential element of any of the offenses defendant was charged and convicted of ("The date of the offense is not an essential factor in child sex offense cases." *People v. Guerrero*, 356 Ill. App. 3d 22, 27 (citing *People v. Burton*, 201 Ill. App. 3d 116, 123)). As such, we reject defendant's third argument.

¶ 69    Defendant's final argument on appeal is that he was not proven guilty beyond a reasonable doubt. His sole contention in support of this is that M.P. demonstrated a lack of truthfulness throughout her testimony. The State responds, noting first that defendant has failed to cite to the applicable standard of review or any relevant case law in support of his argument, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 13, 2025). We agree with the State. Accordingly, defendant has forfeited this argument on appeal. See *Urdiales*, 225 Ill. 2d at 419-420.

¶ 70    Notwithstanding forfeiture, we disagree with defendant. When we review a challenge to the sufficiency of the evidence, as in here, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334.

¶ 71    Here, there is sufficient evidence. Defendant's sufficiency of the evidence argument has to do with the credibility of M.P.  It is well established that we may not substitute our judgment for that of the trier of fact on issues that involve the credibility of witnesses. *People v. Moeller*, 2024 IL App (2d) 230043, ¶ 102. The trial court ultimately found M.P.'s testimony to be credible, noting

that although there were certain inconsistencies, she "persisted in her original story." Further, "if her testimony had been in such a way that it appeared to have been rehearsed or fabricated, that would change my viewing of this case but that is not how it appeared." We defer to that credibility determination.

¶ 72    We also note that many of the inconsistencies pointed out by defendant to show M.P.'s lack of truthfulness are based on mischaracterizations of the record on appeal. For example, defendant states that "M.P. states that the incident occurred in July of 2019. ROP 12/18/23 @ pg. 73, line 14, pg. 74, lines 3-5, and ROP 3/14/24 @ pg. 61." However, this is completely unsupported by the record. The portion of the record cited by defendant to support this statement has to do with the last time M.P. actually spent the night at defendant's home, not the date of the incident. M.P. consistently testified that she did not know the exact date of the incident, but knew it occurred sometime in the summer when she was 12.

¶ 73    Defendant seems to ignore this, instead insisting over and over again that M.P. must be lying: "M.P. never told Donna about what allegedly occurred because Donna died before the alleged acts occurred." The *only* testimony regarding the date of the alleged incident was it occurred sometime in the summer when she was 12. M.P. turned 12 on August 2, 2017. That means the incident could have occurred between August 2, 2017, and August 1, 2018. Given that Donna died in March 2019, it appears as though Donna would have been alive at the time of the alleged incident.

¶ 74    The next inconsistency defendant cites to is regarding M.P.'s hospital roommate. In his brief, defendant states that "M.P. testified that M.P. told an individual named 'Mar' who was her roommate in the hospital when M.P. was hospitalized for her third suicide attempt." This is incorrect. M.P. never testified to the name of the roommate. She testified that after her

grandmother, she told "people at the hospital" about the incident. She also testified to clarify that by "people at the hospital," she meant her roommate. Defendant argues that "[i]f in fact there was truth in what M.P. was saying, the State would have called M.P.'s roommate at the mental health hospital, and a mental health professional." The State is not required to call every single individual who may have tangential knowledge of a particular case. It is only required to prove every element of a charged offense beyond a reasonable doubt. *People v. Crane*, 2020 IL App (3d) 170386, ¶ 29 (citing *People v. Wheeler*, 226 Ill. 2d 92, 114). Further, had the State called M.P.'s roommate, any testimony regarding that conversation likely would have been inadmissible hearsay evidence, as she would be testifying to out-of-court statements made by M.P. ("Hearsay is defined as 'testimony of an out-of-court statement offered to establish the truth of the matter asserted therein***.'" *People v. Evans*, 373 Ill. App. 3d 948, 964 (quoting *People v. Rogers*, 81 Ill. 2d 571, 577)).

¶ 75    "The positive credible testimony of a single witness, even if contradicted by the defendant, is sufficient to convict a defendant." *People v. Sauls*, 2022 IL 127732, ¶ 52 (citing *People v. Gray*, 2017 IL 120958, ¶ 36). Here, the trial court found M.P.'s testimony to be credible. As discussed above, we will defer to that credibility finding (*supra* ¶ 71).

¶ 76    Defendant also takes issue with the fact that the State did not have a treating professional testify about any of M.P.'s mental health conditions. We fail to see how having a treating professional testify would be relevant to whether or not defendant committed the offenses as charged. Again, the State is only required to prove every element of a charged offense beyond a reasonable doubt. *Crane*, 2020 IL App (3d) 170386, ¶ 29 (citing *Wheeler*, 226 Ill. 2d 92, 114).

¶ 77    Another inconsistency that defendant points out has to do with the December 7, 2018, visit; the visit when the police were called. Defendant goes on to state "[i]t was clear that Slocum encouraged M.P. to lie about the incidents of December 2018 and then Slocum, knowing that M.P.

was lying contacted the police, and told the police that M.P. was afraid of being with the [defendant] due to drugs and alcohol, knowing it was not true and not what M.P. stated." This claim is completely without merit, and unsupported by the record. Additionally, the trial court acknowledged the inconsistencies regarding certain dates but still found M.P.'s testimony to be credible. A witness' inability to remember exact dates and times, by itself, does not create a reasonable doubt. *People v. Foley*, 206 Ill.App.3d 709, 715.

¶ 78　　The next inconsistency defendant notes is regarding M.P.'s testimony of the touching of her vagina. Defendant states in his brief: "M.P. went on to say that the [defendant] never touched her vagina. ROP 12/18/2423 [*sic*] @ pg. 93, line 14." This simply is untrue. The portion of the record, in context, that defendant cites read as follows:

> "MR. MINER [DEFENSE ATTORNEY]: And you also indicated that your dad put his mouth on your vagina; is that correct?
>
> M.P.: Yes.
>
> MR. MINER [DEFENSE ATTORNEY]: And I think you indicated he was licking you?
>
> M.P.: Yes.
>
> MR. MINER [DEFENSE ATTORNEY]: Isn't it true that your dad has had a tongue ring since prior to your birth?
>
> M.P.: Yeah. That's exactly why I knew it was his mouth because that is exactly what I felt.
>
> MR. MINER [DEFENSE ATTORNEY]: And as a result of that, did he touch your vagina?

*M.P.: No.*" (Emphasis added.)[2]

Contrary to defendant's statement in his opening brief, M.P. did not testify that defendant *never* touched her vagina. Rather, she testified that *as a result of* her father having a tongue ring, her father did not touch her vagina. Her response may be confusing, but that is largely due to the syntactically confusing nature of the question.

¶ 79     Another inconsistency noted by defendant is regarding M.P.'s testimony of the touching of her breast. Defendant states in his brief that "M.P. testified that the [defendant] touched her breasts, and then never testified that her breasts were touched, only that 'it was close to where to shouldn't have been.' ROP 12/18/23 @ pg. 43, lines 10-11. Therefore, the [defendant] never touched M.P.'s breasts." Defendant again misses the context in which this testimony occurred. That statement was in response to the question whether defendant's hand touched her skin.

¶ 80     Next, defendant states that M.P.'s testimony was not credible because she was never alone with defendant. Again, this is an inconsistency that the trial court noted ("Now, was everything that [M.P.] said factually accurate in terms of dates and times and who was present and who was drunk and who drank 22 beers and so forth? Probably not."). Despite noting this inconsistency, the trial court found M.P. to be credible, particularly her testimony regarding the alleged incident. We defer to that credibility finding (*supra* ¶ 71).

¶ 81     Finally, defendant argues that M.P.'s testimony regarding how the incident occurred was inconsistent. We disagree, and more importantly, the trial court disagreed. M.P.'s testimony regarding the incident was consistent. The trial court heard defendant's argument that M.P.'s testimony is "incredible" and that it would be impossible for the incident to have occurred as M.P. testified. Despite hearing that argument, the trial court nonetheless found M.P.'s testimony to be

---

[2] Emphasis added to indicate the exact portion of the record defendant cited in his brief.

credible and found defendant guilty of the offenses as charged. We defer to the trial court's credibility findings (*supra* ¶ 71).

¶ 82 To close, we again note defendant's numerous Supreme Court Rule violations and his erroneous citations to the record (*supra* ¶ 58). Attorneys in the State of Illinois have a duty to provide competent representation of their clients and a duty of candor towards the tribunal. Ill. R. Pro. Conduct R. 1.1 & 3.3 (eff. Jan. 1, 2010). In the future, we urge counsel to use extreme care in representing clients on appeal and to be mindful of *all* rules.

¶ 83                                III. CONCLUSION

¶ 84 For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 85 Affirmed.